IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ANN WALDROP,

     Plaintiff,

v.

GWINNETT COUNTY SCHOOL
DISTRICT,

     Defendant.

CIVIL ACTION FILE NO.

1:22-cv-2563-SDG-JKL

## FINAL REPORT AND RECOMMENDATION

This is an employment discrimination case in which Plaintiff Ann Waldrop alleges that her employer, Defendant Gwinnett County School District ("GCSD"), discriminated against her in violation of the Americans with Disabilities Act, as amended, 42 U.S.C. § 12101, *et seq.* ("ADA"), by failing to provide her with a reasonable accommodation.  The case is before the Court on Defendant's motion for summary judgment [Doc. 28] and Plaintiff's motion for summary judgment [Doc. 29.]  For the reasons that follow, it is **RECOMMENDED** that Defendant's motion be **GRANTED** and Plaintiff's motion be **DENIED**.

## I.    BACKGROUND[1]

In 2014, Plaintiff began working for Defendant as a staffing assistant. (PSMF ¶ 1.)  She worked on-site at the Instruction Support Center ("ISC") in Suwanee, Georgia.  (PSMF ¶ 5.)  Several GCSD departments are housed at the ISC, including business, finance, retirement, leadership development, counseling and psychological services, special education, information management technology, school nursing, and human resources.  (PSMF ¶ 6.)  As part of her hiring process, she signed a handbook acknowledgement form that listed her "work location" as the ISC.  [*See* Doc. 27-4.]

---

[1] In setting out the facts of this case, the Court has considered Defendant's Statement of Material Facts ("DSMF" [Doc. 28-2]), Plaintiff's Statement of Material Facts ("PSMF" [Doc. 29-1]), Defendant's Response to PSMF, ("R-PSMF" [Doc. 31-1]), Defendant's Statement of Additional Material Facts ("DSAMF" [Doc. 31-2]), Plaintiff's Response to DSMF ("R-DSMF" [Doc. 33]), Plaintiff's Response to DSAMF ("R-DSAMF" [Doc. 36]), and Defendant's reply to R-DSAMF [Doc. 37-1].  The Court has also conducted its own review of the record.  *See* Fed. R. Civ. P. 56(c)(3).  Citations that reference only paragraph numbers from a party's statement of facts or response thereto refer to the statements that are not disputed.  Each supported fact will be deemed admitted unless properly disputed by the responding party.  *See* LR 56.1(B)(2), (3), NDGa.  Where a statement or portion thereof is properly disputed, the Court will view the material evidence and factual inferences in the light most favorable to the nonmoving party and will, as appropriate, cite directly to the evidence supporting the Court's factual recitation.

In April 2016, Plaintiff was promoted to a Human Resources ("HR") Coordinator position, where she reported directly to Dr. Sidney Camp. (PSMF ¶¶ 2-3.) A formal HR Coordinator job description lists the essential job duties of the position to include: (1) coordinating HR staffing reviews; (2) developing and maintaining key performance indicators for HR staffing; (3) conducting appropriate research and collaborating with staff to develop new initiatives; (4) coordinating processes for revising policies and procedures; (5) providing data support for the HR staffing department; (6) coordinating worker requests; (7) participating in status meetings; (8) advising employees on various staffing issues; (9) corresponding with applicants related to employment opportunities; (10) responding to employment concerns; and (11) performing other related duties as required. [Doc. 27-2.]

Historically, Defendant's business philosophy included the requirement that all district employees report to their work location every day. (DSMF ¶ 16). Indeed, Plaintiff admits that before the COVID-19 pandemic she was expected to report physically to work. (Pl. Dep. [Doc. 27-1] at 21-22.) Because of the pandemic, however, from March 2020 to July 2020, Defendant permitted employees, including Plaintiff, to work from home on a temporary basis. (*See*

DSMF ¶¶ 20-21.)  Plaintiff physically returned to work at the ISC in July 2020. (DSMF ¶ 23.)  Shortly after returning to work, however, she tested positive for COVID-19 and quarantined at home for fourteen days.  (Pl. Dep. at 178-79.)  By her own initiative, she continued to work remotely during her period of quarantine because it was a busy time at work.  (*Id.* at 179-80.)  Around mid-July, she returned to work in person.  (*Id.* at 180-81.)

In December 2020, Plaintiff received permission from Dr. Camp to work remotely on a temporary basis because she had concerns about her health and safety in the workplace.  (DSMF ¶ 24.)  Around this time, Plaintiff began seeing a specialist for testing and treatment for a genetic condition known as Alpha-1 antitrypsin deficiency ("Alpha-1"), which she had been diagnosed with a year prior. (*See* PSMF ¶¶ 12, 17.)

In mid-June 2021, while she was still working remotely on a temporary basis, Plaintiff provided documentation to Dr. Camp that her physician had recommended that she work from home.  (DSMF ¶ 27.)  This appears to be the first time Plaintiff offered such documentation.  (*Id*.)  In response, Dr. Camp referred Plaintiff to Defendant's Department of Internal Resolution and Compliance, which is responsible for handling workplace accommodations.  (DSMF ¶ 28.)  On June 23,

4

2021, Plaintiff submitted a request-for-a-reasonable-accommodation form to Dr. Michele Smith, the executive director of GCSD's Department of Internal Resolution and Compliance, Title IX.  (PSMF ¶ 36.)  On the form, Plaintiff wrote:

> I have a genetic condition that leaves me susceptible to all kinds of viruses/bacteria/fungus, all of which can permanently damage my lungs.  There is no treatment or cure for Alpha-1 antitrypsin deficiency, all I can do is protect myself and avoid things that will take years off my life.  My current diagnoses include Alpha-1, nonalcoholic steatohepatitis, sleep apnea, interstitial cystitis, asthma, hypertension, hyperlipemia, congenital heart disease, [and] patent foramen ovale.

(PSMF ¶ 37.)  Plaintiff also met with Dr. Smith via teleconference, where they discussed Plaintiff's job duties and how Plaintiff's condition made returning to work in person risky for her health.  (Pl. Aff. [Doc. 30-1] ¶¶ 20-23.)  During the meeting, Dr. Smith explained the accommodation request process at GCSD and provided paperwork regarding the interactive process Plaintiff.  (DSMF ¶ 30; PSMF ¶ 42.)

On July 9, 2021, Plaintiff returned the accommodation paperwork, including an Interactive Process Questionnaire ("IPQ") completed by her physician, Dr. Fred Rodriguez.  (DSMF ¶ 31; PSMF ¶ 43.)  According to Plaintiff, when she presented the questionnaire to Dr. Rodriguez, he told her that working at home was the best

place for her.  (PSMF ¶ 44.[2])  In any event, on the IPQ, Dr. Rodriguez confirmed

that Plaintiff had physical impairments of congenital heart disease, patent foramen

ovale, alpha 1 antitrypsin deficiency, starting-to-develop emphysema, migraines,

fatty liver, history of jaundice, and asthma; that the impairments were "permanent";

and that they substantially limited her ability to interact with others.  (PSMF ¶¶ 47-

49.)  In response to a question asking him to describe how Plaintiff's limitations

compared to those of an average person in the population, he wrote:

> Ms. Waldrop's body lacks that natural immunity that an average
> person has.  Therefore, her susceptibility to infection, etc. is
> heightened.  She has a rare genetic condition, alpha-1 antitrypsin
> (AAT) deficiency, meaning her body does not make enough of a
> specific protein that protects lungs and liver from damage.  She also
> has a congenital heart disease, a heart defect present from birth.
> Both conditions are permanent and chronic.  These conditions make
> her clinically vulnerable.  Her immune deficiency leaves her
> vulnerable to anything in the environment that is detrimental to her
> lungs particularly and to her immune system, generally.  As a
> congenital heart disease patient, she remains high risk for serious
> complication from Covid-19 and associated variants.  It is extremely

---

[2] Defendant objects to Plaintiff's summary of what Dr. Rodriguez said as inadmissible hearsay.  Even if it is hearsay, the Court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form, *Rowell v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005), *Macuba v. Deboer*, 193 F.3d 1316, 1322-23 (11th Cir. 1999), and because Defendant has not offered anything to suggest that Dr. Rodriguez did not make the statement in question, there is no reason to believe that it could not be reduced to an admissible form at trial.

helpful to her to control her interaction with others and to control her environment.

(PSMF ¶ 50.)   When asked if Plaintiff could nevertheless perform all of the essential functions and physical requirements of her job, Dr. Rodriquez responded "yes." (PSMF ¶ 51.)  And when asked to describe any reasonable accommodations that would enable her to perform the essential duties of her job, he wrote:  "to continue to work remotely." (PSMF ¶ 52.)

After reviewing the initial paperwork, Dr. Smith determined that Plaintiff was eligible for a workplace accommodation under the ADA (DSMF ¶ 37), and on July 14, 2021, she met with Plaintiff via videoconference to discuss their options, (Pl. Aff. ¶ 31).  Dr. Smith informed Plaintiff that her request to work from home would be denied because the district wanted all of its "employees to return back to their work locations." (*Id*. [3] )   Dr. Smith nevertheless identified several accommodations that Defendant could provide, including:  (1) a reassigned personal office space with a limited number of other employees; (2) personal selection of preferred seating during team meetings; (3) modified early arrival and

---

[3] Defendant objects to Plaintiff's summary of what Dr. Smith said as inadmissible hearsay. (R-PSMF ¶ 56.)  Even if it is hearsay, the court may consider it at this stage of the proceedings because the statement could be reduced to an admissible form at trial.

departure schedule to avoid crowds; and (4) direct collaboration with Dr. Camp to identify work schedule and location, in addition to implementation of face masks and social distancing measures.  (DSMF ¶¶ 38, 39; PSMF ¶ 54.)  Dr. Smith also identified July 19, 2021, as the date Plaintiff would return to the office.  (DSMF ¶ 39.)

Immediately after the meeting, Plaintiff called Dr. Camp and told him that her remote work request had been denied.  (Pl. Aff. ¶ 37; PSAF ¶ 38.)  According to Plaintiff, Dr. Camp stated that the denial of her request to work from home "had nothing to do with [Plaintiff's] job, instead it was about [Defendant's] culture." (Pl. Aff. ¶ 38.)  Plaintiff then noted that she felt as though the decision to deny her request had been made before she had even submitted the IPQ with Dr. Rodriguez's medical opinions.  (*Id.*)  Dr. Camp agreed.  (*Id.*)

On July 15, 2021, Dr. Camp granted Plaintiff an additional ten days of remote work to enable Plaintiff to talk further with her medical providers.  (DSMF ¶ 40.)  After additional conversations between Plaintiff, Dr. Smith, and Dr. Camp, Dr. Smith met with Plaintiff on July 26, 2021, and offered the following additional accommodations:  (1) reassigning her to a personal, on-site modular office location (referred to as a "work cottage") with its own HVAC system; (2) providing access

to a limited or restricted-use restroom; (3) modifying her work schedule to allow early arrival and departure to minimize contact with others during high-traffic periods; (4) providing access to an isolated and underutilized parking lot near the work cottage; (5) permitting Plaintiff to select preferred seating during team meetings and in teamwork spaces; and (6) continued implementation of safety measures, such as the use of protective personal equipment, cleaning and sanitizing materials, and social distancing protocols.  (DSMF ¶ 41; PSMF ¶ 68; Aff. of Dr. Michelle Smith [Doc. 28-4] ¶ 31.)  Dr. Smith also told Plaintiff that she was now expected to return to work on Monday, August 2, 2021.  (PSMF ¶ 68.) Significantly, when Plaintiff informed her doctors about the offered accommodations, they indicated that such an arrangement would be the same as working from home for purposes of managing her conditions.  (Pl. Dep. at 147-48.)

Plaintiff declined the accommodations offered by Dr. Smith.  (Pl. Dep. at 95.)  And while Plaintiff spoke with Dr. Camp the possibility of working from home at least until she could provide additional documentation, Plaintiff's "understanding was also that none of that was going to change, that it was going to remain the same because of the—of the political reasons."  (*Id.* at 95-96.)  In a recorded conversation with Dr. Camp after Dr. Smith had conveyed the proposed

accommodation, Dr. Camp told Plaintiff that "this has nothing to do with anything other than the district is not supporting folks working from home . . . because there's hundreds of people that would like to work from home." (Pl. Aff. ¶ 39.) Notably, in that same conversation, Dr. Camp encouraged Plaintiff to continue with the interactive process and take Defendant's proposal back to her own doctors for their feedback because "otherwise, you are not engaging in the interactive process." [Doc. 30-2 at 46-47.]

Around July 29, 2021, instead of returning to work on an in-person basis, Plaintiff went out on extended leave. (Pl. Dep. at 95-97.) Then, in early August 2021, Plaintiff moved to Alabama, about a 90-minute drive from the ISC. (*Id.* at 127-30.) Since that time, Plaintiff has been working for a different company while she remains on leave status with Defendant. (*Id.* at 138; DSMF ¶ 50.)

On June 27, 2022, Plaintiff filed this action against Defendant, asserting a failure to accommodate claim under the ADA. [Doc. 1 at 8.] Following discovery, on March 6, 2023, the parties filed cross motions for summary judgment, which are now ripe for review.[4] [*See* Docs. 28, 29.]

---

[4] Defendant objects to the form of Plaintiff's Response Brief because Plaintiff incorporated arguments by reference from her Summary Judgment Brief. [Doc. 37 at 1-8.] Cross-referencing prior arguments can be confusing, and the

## II.   SUMMARY JUDGMENT STANDARD

A court should grant summary judgment when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  The movant bears the initial burden of showing that it is entitled to summary judgment.  *Id.* ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").  If that burden is met, the burden shifts to the non-moving party, who is required to "to go beyond the pleadings" and to present competent evidence in the form of affidavits, answers to interrogatories, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quotation omitted); *see* Fed. R. Civ. P. 56(c).

Where the party responding to a statement has neither refuted nor stated valid objections to the material facts as set forth in the statement, those facts are deemed admitted by operation of law.  LR 56.1B(2), NDGa.; *Reese v. Herbert*, 527 F.3d 1253, 1267-69 (11th Cir. 2008).  In those instances where a party denies a statement

---

practice is generally frowned upon; however, here, the Court has had no difficulty understanding Plaintiff's arguments or locating record references.

of fact (in whole or in part), the Court has reviewed the record to determine whether it is disputed and, if so, whether any dispute is material. The Court has also excluded assertions of fact by either party that are immaterial or presented as arguments or legal conclusions, as well as assertions of fact unsupported by a citation to evidence in the record, stated as a legal conclusion, or asserted only in the party's brief and not the statement of facts. *See* LR 56.1B(1), NDGa.; *see also Chapman v. AI Transp.*, 229 F.3d 1012, 1051 n.34 (11th Cir. 2000) (en banc) (subjective perceptions, conclusory allegations, or allegations that are otherwise unsupported by record evidence do not create genuine issues of material fact to withstand summary judgment); *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (same).

## III. DISCUSSION

Plaintiff asserts that Defendant discriminated against her in violation of the ADA by denying her request to work remotely full-time as an accommodation for her disability. To prevail on an ADA discrimination claim, a plaintiff must produce sufficient evidence to permit a jury to find that she: (1) is disabled, (2) is a qualified individual, and (3) was discriminated against because of her disability. *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1179 (11th Cir. 2019). "An employer's failure to reasonably accommodate a disabled individual is itself discrimination,

12

and the plaintiff does not bear the additional burden of having to show that the employer acted in a discriminatory manner toward its disabled employee." *Byrd v. UPS*, 814 F. App'x 536, 539 (11th Cir. 2020).

The primary question in this case is whether physical attendance was an essential function of Plaintiff's job with Defendant, as it goes not only to whether Plaintiff was a "qualified individual" under the ADA, but also to the reasonableness of any proposed accommodation.[5] Defendant argues that the record compels a finding that it was an essential function of Plaintiff's job, and, that as a result, she is not a "qualified individual" and her requested accommodation was not reasonable. [Doc. 28-1 at 10-19.] Plaintiff counters that evidence in fact compels the opposite finding: that working on-site was not an essential function of her job, since she was able to work remotely throughout the pandemic, and that she is

---

[5] A "disability" under the ADA "is a physical or mental impairment that substantially limits one or more major life activities of [an] individual." 42 U.S.C. § 12102(1). Plaintiff has presented undisputed evidence from Dr. Rodriguez indicating that her impairments interfere with her major life activity of interacting with others. (PSMF ¶ 49; *see also* Doc. 31 at 3.) Based upon that, Defendant concedes that, for purposes of summary judgment, Plaintiff is "disabled," as that term is defined in the ADA. [*See* Doc. 31 at 3.] And while Defendant contests Plaintiff's assertion that she is also limited in the major life activity of working [*id.*], that issue is immaterial for present purposes since she is presumed to be disabled based upon her limited ability to interact with others.

therefore a qualified individual and her requested accommodation was also reasonable.  [Doc. 29 at 16-22.]  Along these lines, she contends that Defendant has not shown that allowing her to work from home would impose an undue hardship on the operation of Defendant's business or pose a threat to her health or the health of others.  [*Id.* at 22-24.]

Under the ADA, a "qualified individual" is defined as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  Therefore, "[t]o survive summary judgment, a plaintiff must show there is a genuine issue as to whether she either 'can perform the essential functions of her job without reasonable accommodation, or failing that, can perform the essential functions of her job with a reasonable accommodation.'"  *Everett v. Grady Mem'l Hosp. Corp.*, 703 F. App'x 938, 942-43 (11th Cir. 2017) (cleaned up) (quoting *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1256 (11th Cir. 2007)).

"Essential functions are 'the fundamental job duties of the employment position the [disabled employee] holds or desires.'"  *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1258 (11th Cir. 2001) (quoting 29 C.F.R. § 1630.2(n)(1)). "Determining whether a particular job duty is an essential function involves a

factual inquiry to be conducted on a case-by-case basis." *Id*.  The court must consider the employer's judgment about needs of a position, including "the employer's determination, the written job description, and testimony from the plaintiff's supervisors." *Everett*, 703 F. App'x at 943-44.  The court also gives "substantial weight" to the employer's judgment as to which functions are essential, *Holly*, 492 F.3d at 1258, and "the inquiry into essential functions is not intended to second guess an employer's business judgment with regard to production standards," 29 C.F.R. § Pt. 1630.2(n), app. at 417.  "That being said, an employer's judgment is not conclusive, because then an employer that did not wish to be inconvenienced by making a reasonable accommodation could, simply by asserting that the function is 'essential,' avoid the clear congressional mandate." *Everett*, 703 F. App'x at 943 (quoting *Holly*, 492 F.3d at 1258) (internal quotation marks omitted).  "Other pertinent factors to consider include (1) the amount of time the employee spends performing the function; (2) the consequences of not requiring the employee to perform the function; (3) the work experience of past employees in the position; and (4) the current work experience of employees in similar jobs." *Garrison v. City of Tallahassee*, 664 F. App'x 823, 826 (11th Cir. 2016) (citing 29 C.F.R. § 1630.2(n)(3)).

15

Beyond the issue of an individual's qualification for a position, the essential functions of a job also inform the reasonableness of any requested accommodation. In the context of the ADA, the term "reasonable accommodation" means any "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position . . . is customarily performed, that enable an individual with a disability who is qualified to perform the ***essential functions*** of that position." 29 C.F.R. § 1630.2(o)(1)(ii) (emphasis added). An ADA plaintiff must therefore show that a putative accommodation is reasonable, in that "it enables the employee to perform the essential functions of the job." *Holly*, 492 F.3d at 1256. Reasonable accommodations may include modified work schedules, job restructuring, reassignment to a vacant position, or modifying equipment. *Id.* § 1630.2(o)(2)(ii). But regardless of how an accommodation is structured, the ADA does not require an employer to eliminate an essential function of the plaintiff's job, even if it may require an employer to restructure or modify some of the more marginal functions a particular job. *Id.*; *see also W.W. Grainger, Inc.*, 257 F.3d at 1260 ("The difference between the accommodation that is required and the transformation that is not is the difference between saddling a camel and removing its hump.").

With these standards in mind, and viewing the record in the light most favorable to Plaintiff, the Court concludes that Defendant has demonstrated there is no genuine issue of material fact that physical attendance is an essential function of Plaintiff's position.  In addition to the facts recited above, Defendant supports its position with an affidavit from Dr. Camp, testifying that Plaintiff's job "required her physical presence at work," and that her specific on-site job duties included:

> creating[] and setting-up presentations for higher level executives; interacting and collaborating with employees in-person; screening, interviewing, and fingerprinting job applicants and others; conducting face-to-face external screenings of school administrators; accessing and preparing hard copies of documentation housed on site; facilitating the on-boarding process for new hires by providing and overseeing the completion of paperwork and notarizing forms; greeting in-office visitors; attending in-person conferences, job fairs, and other recruitment events; traveling to local schools; and attending training and other meetings at the ISC and other District locations.

(Aff. of Dr. Sidney Camp [Doc. 28-5] ¶ 12.)  Dr. Camp also explained that Defendant's longstanding "business philosophy" has been for all employees to report to their work location.  (*Id.* ¶¶ 10-11; *see also* DSMF ¶ 16.)  In addition, Dr. Camp and Dr. Smith both attested that Defendant had never posted a long-term, permanent, or full-time remote position in the HR Division, and that no employee in the HR Division had otherwise been permitted to work from home on a regular, permanent, or full-time basis as an accommodation—for a disability or for any

other reason.  (DSMF ¶¶ 17, 18.[6])  Also, as mentioned above, Defendant's own job description identified multiple tasks that contemplated physical presence, such as participating in status meetings, advising other employees on staff issues, and responding to employment concerns.  [*See* Doc. 27-2.]  Beyond this, Plaintiff signed a form when she started with Defendant that indicated that her work location would be the ISC [*see* Doc. 27-4], and admits that until the COVID-19 pandemic, she was expected to report physically to work and indeed worked in-person, including at job conferences and at job fairs, (*see* Pl. Dep. at 21-22, 172; *see also* Pl. Aff. ¶ 5 (stating that at the beginning of her employment she was "assigned to work on-site" from the ISC).)

Despite the foregoing, Plaintiff contends that a reasonable factfinder might (or indeed must) conclude that physical presence was not an essential part of her job.  With regard to the formal job description, she points out that in the "essential job duties" section includes no mention of "physical presence."  [Doc. 34 at 3.[7]]

---

[6] Plaintiff denies these statements; however, the cited materials do not support a contrary proposition.  (*See* R-DSMF ¶¶ 17, 18.)  These statements are therefore deemed admitted.

[7] Plaintiff's brief in opposition to Defendant's motion for summary judgment is not paginated, so when citing to specific portion of that brief, the Court refers to the page numbers automatically applied by the Court's electronic filing system.

Plaintiff also quibbles with Dr. Camp's statement that in-person attendance was required. In support, she cites to page 16 of her deposition testimony in which she summarized the job duties of the first position she held with GCSD. (*See* Pl. Dep. at 16.) Plaintiff also cites a portion of her affidavit in which she summarized a discussion she had with Dr. Smith. (*See* Pl. Aff. ¶ 21.[8]) In that discussion, Plaintiff said that her day-to-day job duties:

> were to handle a lot of data analytics, respond to requests for data from individuals working in various GCPS departments and externally, build queries in PeopleSoft, create spreadsheets, diagrams and presentations based on data I would acquire, research and compile data, work on various GCPS software upgrades, prepare staffing reports, and retrieve and pull electronic documents in response to requests for information and hold meetings via Zoom.

(*See id.*) To this, Dr. Smith responded, "So a lot of your day-to-day activities was with your main frame, online." (*Id.*) Plaintiff characterizes this response as Dr. Smith "acknowledge[ing] that most of Mrs. Waldrop's day-to-day activities were via her computer online." [Doc. 29 at 9, 17, 21; *see also* Doc. 34 at 13.] Plaintiff herself attests that much of her job was done on the computer and that she possessed the requisite security clearance to access virtually any information or data she

---

[8] This conversation is one of nine meetings with employees of Defendant that Plaintiff recorded and had transcribed for purposes of this litigation. [*See* Doc. 30-2.] The transcript of the meetings is attached as Exhibit A to her affidavit. [*Id.*]

needed remotely.  [Doc. 34 at 4-5.]  Working from home was effective, she maintains, since she received no complaints about her job performance while working remotely and, in fact, was praised for her work.  (*See* Pl. Aff. ¶ 14; Pl. Dep. at 211.)  And in further support, she cites to the fact that Defendant maintains a policy authorizing the use of portable electronic devices (such as laptops) for district-related business.  (PSMF ¶ 70.)

But even viewing the record in the light most favorable to Plaintiff, the Court cannot find that Plaintiff has presented sufficient evidence that physical presence was not an essential function of her job.  As an initial matter, courts have considered physical presence to be an essential function of most jobs.  *See Weber v. BNSF Ry. Co.*, 989 F.3d 320, 325 (5th Cir. 2021) ("We have observed that 'there is a general consensus among courts, including ours, that regular work-site attendance is an essential function of most jobs.'") (quoting *Credeur v. La. ex. rel. Off. of Att'y Gen.*, 860 F.3d 785, 793 (5th Cir. 2017)); *E.E.O.C. v. Ford Motor Co.,* 782 F.3d 753, 761 (6th Cir. 2015) (explaining the general rule that "regularly attending work on-site is essential to most jobs, especially the interactive ones" and that such a rule "aligns with the text of the ADA"); *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir. 2012) ("It is a 'rather common-sense idea . . . that if one is not

able to be at work, one cannot be a qualified individual.'") (quoting *Waggoner v. Olin Corp.,* 169 F.3d 481, 482 (7th Cir. 1999)).  And in cases where teleworking is at issue, as it is in the present case, courts typically consider how interactive the job is to determine whether physical presence is essential.  *See Garrison*, 664 F. App'x at 826 (affirming district court's conclusion that Plaintiff's "position was customer-service oriented and that being physically present in the office during regular business hours was an essential function of [Plaintiff's] job"); *Abram*, 598 F. App'x at 677 (affirming district court's conclusion that a reasonable jury would have been compelled to find that a front-desk receptionist's physical presence at work was an essential function and that remote work was not a reasonable accommodation); *see also Credeur*, 860 F.3d at 793 (explaining that the general rule that work-site attendance is an essential function is "especially true when the position is interactive and involves a significant degree of teamwork"); *Ford Motor Co.,* 782 F.3d at 761 (noting that the general physical presence rule was "for good reason: most jobs require the kind of teamwork, personal interaction, and supervision that simply cannot be had in a home office situation.") (internal quotation omitted); *Rauen v. U.S. Tobacco Mfg. Ltd. P'ship*, 319 F.3d 891, 897 (7th Cir. 2003) (determining that Plaintiff's employment did not "present the type of 'very

extraordinary case' where a home office would be reasonable," because her job required "teamwork, interaction, and coordination of the type that requires being in the work place"). So while Plaintiff is correct that her job description did not explicitly say that her physical presence was required, it also did not say that her job could be performed remotely either. And what matters instead are how her duties were performed, and it is clear Plaintiff's job, as described above, involved a high degree of interaction with others, such as working closely with coworkers; collaborating with other HR personnel on new policies, initiatives, and procedures; meeting with employees about HR-related issues, requests, and concerns; and interviewing candidates for jobs. Critically, too, Dr. Camp testified in no uncertain terms that physical presence was required for the HR Coordinator position. *See Abram*, 598 F. App'x at 677 (finding employer carried burden of establishing physical presence at a reception desk was an essential job function based on supervisor's affidavit testimony even though written job description was silent).

The evidence that Plaintiff musters to avoid the conclusion that her presence was essential falls short. As noted above, she cites to page 16 of her deposition testimony, summarizing the job duties of the first position she held with GCSD; however, the requirements of that position reveal little to nothing about whether in-

22

person presence was required for the HR Coordinator position. (*See* Pl. Dep. at 16.)   Likewise, Plaintiff's attempt to make hay out of Dr. Smith's supposed "acknowledgement" that Plaintiff's duties were mostly remote misunderstands Dr. Smith as ***agreeing*** with Plaintiff's recitation of her job duties.  But Dr. Smith did no such thing; she was merely summarizing Plaintiff's own description of the job duties that could be done remotely.  [*See* Doc. 30-2 at 27.]  What's more, Plaintiff's argument that "most of [her] day-to-day activities were via her computer online," [Doc. 29 at 9, 17, 21; Doc. 34 at 13], necessarily concedes that there were occasions when she was required to perform duties on-site or in-person.  In this same vein, Plaintiff not only admitted that she was expected to be physically present before the pandemic, but also that that her job duties never materially changed with onset of the pandemic, thus confirming that there was no underlying reason for Defendant's expectations about the position and its essential functions to change. (*See* Pl. Dep. at 21-22; Pl. Aff. ¶ 22.)

The best that Plaintiff can offer in support of her argument that physical presence was not an essential function of her job is that she was in fact allowed to work remotely on a temporary basis from March to July 2020 (when nearly all of Defendant's employees worked remotely due to COVID-19) and again from

December 2020 to July 2021 when Dr. Camp permitted her to do so, and that she was generally able to accomplish her job responsibilities remotely.  [Doc. 29 at 15-17.]  But there is a difference between working remotely on a temporary basis and doing so permanently or for an indefinite period.  *See Kinney v. St. Mary's Health, Inc.*, No. 320CV00226RLYMPB, 2022 WL 4745259, at *6 (S.D. Ind. Aug. 31, 2022) ("Plaintiff may have been given leeway to work from home at the beginning of the pandemic, but the undisputed evidence reflects that being present on site was a necessary function of her position.").  As the Eleventh Circuit explained, "even if an employer has voluntarily provided accommodations to the employee historically, that employer is not obligated to continue providing them and can discontinue such when they exceed what is legally required under the ADA." *D'Onofrio v. Costco Wholesale Corp.*, 964 F.3d 1014, 1022 (11th Cir. 2020).  And there is no dispute that the work-at-home arrangement that Defendant permitted— whether on a global basis in 2020 due to the COVID-19 shelter-in-place order or during the seven-month period after she received her diagnosis—was indeed a ***temporary*** arrangement.  Moreover, Defendant has come forward with evidence, namely uncontested affidavit testimony from Dr. Camp, affirming that if Plaintiff were permanently shifted to remote work Defendant would have to reassign her

24

on-site duties to another employee, hire an employee to handle these duties, or forgo the completion of the tasks.  (Camp Aff. ¶¶ 12, 16.)  And were this not enough, Dr. Camp testified that no employee under his supervision has ever been allowed to work remotely on a full-time, regular, long-term basis.[9]  (*Id.* ¶ 11.)

Without more than Plaintiff's own assessment that she could adequately fulfill her job responsibilities remotely, the Court concludes that that there is no genuine dispute of fact over whether Plaintiff's physical present was an essential function of her position.  And given her refusal to attend work in person, Plaintiff is incapable of fulfilling an essential function of her job, and thus not a "qualified individual" under the ADA.  Likewise, because her requested accommodation—that she be allowed to work remotely on a permanent basis—would have eliminated an essential function, it is not reasonable.  Accordingly, summary judgment should be **GRANTED** in favor of Defendant.

---

[9] Plaintiff attempts to refute this by pointing to her deposition testimony and an interrogatory response in which she identified several individuals by name. (*See* R-DSMF ¶ 19.)  Plaintiff's deposition testimony, however, indicates that she believed that there were individuals who were "remote at times," but she could not identify anyone who worked remotely on an indefinite or permanent basis. (*See* Pl. Dep. at 21.)  Likewise, her interrogatory response lacks any detail about individuals she contended were allowed to work remotely, including whether they held jobs that were similar to hers or circumstances for their remote work. [*See* Doc. 27-16 at 14.]

But even if Plaintiff's physical presence were not an essential job function, Defendant is still entitled to summary judgment because the record indisputably shows that Defendant engaged in good faith in the interactive process required by the ADA and actually offered her an accommodation.  It is axiomatic that "an employer is not required to accommodate an employee in any manner in which the employee desires." *Gilliard v. Ga. Dep't of Corr.*, 500 F. App'x 860, 868 (11th Cir. 2012) (citing *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285-686 (11th Cir. 1997)).  "The regulations governing the ADA provide that, to determine the appropriate reasonable accommodation, it may be necessary for an employer 'to initiate an informal, interactive process with the qualified individual with a disability in need of an accommodation' to identify the person's limitations and possible accommodations." *Id.* (quoting 29 C.F.R. § 1630.2(o)(3)). Importantly, an employer cannot be held liable under the ADA where it "made reasonable efforts to communicate with the employee and to provide accommodations based on the information it possessed, and where the employee's actions caused the breakdown in the interactive process." *Id.*

Here, the record demonstrates that it was Plaintiff who caused the breakdown in the interactive process when she failed to provide information sufficient to

26

support her stated belief that any accommodation short of permanent, fully-remote work was unreasonable in light of her health conditions.  To recap, in July 2021, after Plaintiff submitted paperwork formally requesting permanent remote work, both Dr. Camp and Dr. Smith worked with Plaintiff to craft potential workplace accommodations.  During that period, Defendant allowed Plaintiff to work remotely and even extended her return-to-work dates to give her time to provide additional information about her condition and workplace needs from her physicians.  The last accommodation that Defendant offered included a private work cottage with her own HVAC system, a limited or restricted-use bathroom, access to an isolated and underused parking lot, a modified work schedule to minimize contact with others, and continued implementation of safety measures such as cleaning and social distancing.

Plaintiff argues by assertion that this proposed accommodation was unreasonable because it "would still require Plaintiff to traverse through a building that hundreds of people would access every day, thus exposing her to a multitude of viruses, bacteria, fungus, and irritants that would permanently damage her lungs and take years of her life; as such it was not reasonable."  [Doc. 35 at 10.]  But Plaintiff provides no evidence to support that she gave Defendant any reason to

think she was physically or medically unable to even walk through the ISC building, or even identified this concern to Defendant during the interactive process. Indeed, even now, she does not point to evidence that any of her medical professionals expressed a view one way or another whether Defendant's proposed arrangement was deficient.[10]   Beyond this, Dr. Camp explicitly encouraged Plaintiff to get feedback from her doctors on Defendant's proposed accommodations and warned her that she had to continue to engage in the interactive process. [Doc. 30-2 at 46-47.]  But instead of reengaging her doctors and explaining why Defendant's proposal was supposedly insufficient, Plaintiff simply demanded permanent full-time remote work.  When that did not work, she then took leave, moved an hour and a half away without notifying Defendant, and ultimately began working at a different company.  (*See* Pl. Dep. at 131-33.)  As a result, there is no genuine dispute that any breakdown in the interactive process is attributable to Plaintiff.  And because the evidence establishes that Plaintiff is responsible for the breakdown, Defendant cannot be held liable under a failure to

---

[10] Plaintiff testified at her deposition that when she told her doctors about the offered accommodations, they indicated such an arrangement would be no different than working from home, except that at home she could control cleaning products that were used.  (Pl. Dep. at 147-48.)

accommodate claim. *See Gilliard*, 500 F. App'x at 870 (granting summary judgment to employer where the employee "caused a breakdown in [the interactive] process where she failed to provide any medical documentation outlining her work limitations or any substantive reason explaining why the proposed alternative accommodation was unreasonable"). Summary judgment should be **GRANTED** to Defendant for this separate reason.

## IV.   CONCLUSION

In sum, no reasonable finder of fact could conclude that Defendant would be liable for failing to accommodate Plaintiff's disability. For the foregoing reasons, it is **RECOMMENDED** that Defendant's motion for summary judgment, [Doc. 28], be **GRANTED** and that Plaintiff's motion for summary judgment, [Doc. 29], be **DENIED**.

IT IS SO RECOMMENDED this 24th day of May, 2023.

JOHN K. LARKINS III
United States Magistrate Judge

29