**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| ANN WALDROP,<br><br>  Plaintiff,<br><br>  v.<br><br>GWINNETT COUNTY SCHOOL DISTRICT,<br><br>  Defendant. | Civil Action No.<br>1:22-cv-02563-SDG |

**OPINION AND ORDER**

This matter is before the Court on United States Magistrate Judge John K. Larkins III's Final Report and Recommendation (R&R) [ECF 39] recommending that Defendant Gwinnett County School District's (GCSD) motion for summary judgment [ECF 28] be **GRANTED** and that Plaintiff Ann Waldrop's motion for summary judgment [ECF 29] be **DENIED**. Waldrop objected to the findings and conclusions in the R&R [ECF 42]. After careful consideration of the R&R and the parties' briefing, the Court **OVERRULES** Waldrop's objections, **ADOPTS** the R&R's recommended judgment, **GRANTS** GCSD's motion for summary judgment, and **DENIES** Waldrop's cross-motion.

1

**I.    Background**[1]

This is an employment dispute case. Waldrop contends that GCSD violated the Americans with Disabilities Act (ADA) by failing to provide a reasonable accommodation for her disability.[2]

**A.    Factual Background**

Waldrop began working for GCSD in 2014. She was initially employed as a staffing assistant and, in 2016, was promoted to Human Resources Coordinator. In this position, she reported directly to Dr. Sidney L. Camp, Jr.[3] Until March 2020, Waldrop admits that she was expected to, and by all accounts did, report to work at the Instruction Support Center (ISC) in Suwanee, Georgia. In fact, when hired in 2014, she signed a form acknowledging that ISC was her "work location."[4] Both parties admit that "historically, the District's business philosophy . . . included the requirement that all District employees report to their work location every day."[5]

---

[1] This Order repeats the facts from the R&R as necessary to analyze the objections. The other facts in the R&R are incorporated by reference. *See Garvey v. Vaughn*, 993 F.2d 776, 779 n.9 (11th Cir. 1993) (noting that, to the extent there are no specific objections made to factual findings by a magistrate judge, there is no requirement that the district court review those findings *de novo*).

[2] ECF 1, at 8.

[3] ECF 27-1, at 15–17.

[4] ECF 27-4.

[5] ECF 28-2, ¶ 16.

The Covid-19 pandemic triggered a ubiquitous shift to remote work (if possible) in order to protect the health and safety of employees. GCSD was no exception. From March 2020 to July 2020, GCSD permitted employees, including Waldrop, to work remotely.[6] Waldrop returned in July 2020, and shortly thereafter, contracted Covid-19.[7] She worked remotely from home while quarantining due to her illness, and in mid-July, returned to in-person work.[8] Come December, Waldrop developed workplace health and safety concerns, which she discussed with Dr. Camp. Dr. Camp agreed to let her work remotely on a temporary basis while she consulted with her doctors about her conditions.[9]

In mid-June 2021, Waldrop provided documentation to Dr. Camp indicating that her physician recommended she work from home.[10] Dr. Camp referred Waldrop to GCSD's Department of Internal Resolution and Compliance, which handles workplace accommodations.[11] On June 23, 2021, Waldrop submitted a request-for-a-reasonable-accommodation form.[12] Dr. Michele Smith, who was

---

[6] ECF 29-1, at 6.

[7] *Id*

[8] *Id*. at 7.

[9] ECF 28-2, ¶ 24.

[10] *Id*. ¶ 27.

[11] *Id*. ¶ 28.

[12] ECF 29-1, ¶ 36.

responsible for the workplace accommodations process at GCSD, met with Waldrop to discuss her request.[13] Additionally, part of the process required Waldrop to complete paperwork, including an "interactive process questionnaire" to be completed by her doctor.[14] Her doctor's suggested accommodation was to allow Waldrop to continue to work remotely.[15] After review of the paperwork, Dr. Smith determined that Waldrop qualified for a workplace accommodation.[16]

On July 14, 2021, Dr. Smith met with Waldrop. She informed Waldrop that her request for remote work was denied because GCSD was requiring in-person attendance.[17] However, Dr. Smith offered Waldrop a series of other accommodations. These included: (1) a reassigned personal office space with a limited number of other employees; (2) personal selection of preferred seating during team meetings; (3) modified early arrival and departure schedule to avoid crowds; and (4) collaboration with Dr. Camp to discuss other potential measures in addition to implementation of face masks and social distancing measures.[18]

---

[13]   *Id.* at 13.

[14]   ECF 27-10.

[15]   *Id.*

[16]   ECF 28-2, ¶ 37.

[17]   ECF 29-1, at 19.

[18]   ECF 28-2, ¶ 39.

4

Waldrop's expected return date was July 19, 2021.[19] However, on July 15, Dr. Camp allowed Waldrop an additional ten days of remote work to allow her to communicate with her doctors about the accommodations.[20] During this period, Dr. Camp, Dr. Smith, and Waldrop continued to discuss potential accommodations. GCSD then offered the following set of accommodations: (1) reassigning Waldrop to a personal, on-site modular office location ("work cottage") with its own HVAC system; (2) providing access to a limited or restricted-use restroom; (3) modifying her work schedule to allow early arrival and departure to minimize contact with others during high-traffic periods; (4) providing access to an isolated and underutilized parking lot near the cottage; (5) permitting Waldrop to select preferred seating during team meetings and in teamwork spaces; and (6) continued implementation of safety measures such as the use of protective personal equipment, cleaning and sanitizing materials, as well as social distancing protocols.[21]

Dr. Camp, Dr. Smith, and Waldrop continued to discuss options. During a conversation between Waldrop and Dr. Camp, Dr. Camp noted that the only documentation they had from Waldrop's doctor indicated that performing her job

---

[19] *Id.*

[20] *Id.* at 40.

[21] *Id.* at 41.

in her home environment is *preferred*, "but not required."[22] Dr. Camp again encouraged Waldrop to present her doctor with the second set of accommodations, which included a self-contained working environment (the "work cottage"), and to continue to discuss options as needed.[23] Waldrop presented these accommodations to her doctor, and Waldrop acknowledged that her doctor told her that these accommodations would be the equivalent of Waldrop working from home.[24] But Waldrop did not inform anyone at GCSD of her doctor's opinion. Nor did she further inquire with her doctor about any other potential accommodations that might suffice. In fact, Waldrop never provided GCSD with documentation or reason to believe that remote work was the *only* reasonable accommodation. Though the lines of communication between all parties remained open, Dr. Smith set Waldrop's return date as August 2, 2021.

Instead of returning to work on August 2 or continuing to work with Dr. Smith and her doctors, Waldrop took medical leave from GCSD, sold her home, and moved to Alabama.[25] She began a new job shortly thereafter, though

---

[22] ECF 30-2, at 46.

[23] *Id.*

[24] ECF 28-3, at 147–48.

[25] ECF 28-2, ¶ 47.

she remained on leave with GCSD during that time.[26] Waldrop filed suit on June 27, 2022, asserting a failure to accommodate claim under the ADA.[27]

### B. The R&R

Both parties filed motions for summary judgment. The R&R recommends denying Waldrop's motion and granting GCSD's motion. First, the Magistrate Judge concluded that physical presence was an essential function of Waldrop's job. Because physical presence was required, GCSD's accommodations were reasonable. Additionally, the R&R recommends that, even if physical presence were not an essential job function, the Court grant GCSD summary judgment because it engaged in the accommodations process in good faith and it was Waldrop who abandoned the interactive process and is responsible for the breakdown of the accommodations process. Waldrop filed objections to both conclusions.

## II. Legal Standard

### A. Objections to a Report and Recommendation

A party challenging a report and recommendation issued by a United States Magistrate Judge must file written objections that specifically identify the portions of the proposed findings and recommendations to which an objection is made and

---

[26] *Id.* at 50.

[27] ECF 1.

must assert a specific basis for the objection. *United States v. Schultz*, 565 F.3d 1353, 1361 (11th Cir. 2009). The district court must "make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)*; Jeffrey S. ex rel. Ernest S. v. State Bd. of Educ. of Ga.*, 896 F.2d 507, 512 (11th Cir. 1990). The district court reviews portions of the R&R to which specific objections have not been made for clear error. *Macort v. Prem, Inc.*, 208 F. App'x 781, 784 (11th Cir. 2006).

### B.     Summary Judgment

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it can affect the outcome of the lawsuit under the governing legal principles. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party seeking summary judgment has the burden of informing the district court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If a movant meets its burden, the party opposing summary judgment must present evidence showing either (1) a genuine issue of material fact or (2) that the movant is not entitled to judgment as a matter of law. *Id.* at 324.

In determining whether a genuine issue of material fact exists, the evidence is viewed in the light most favorable to the party opposing summary judgment, "and all justifiable inferences are to be drawn" in favor of that party. *Anderson*, 477 U.S. at 255; *see also Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1246 (11th Cir. 1999). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions," and cannot be made by the Court in evaluating summary judgment. *Anderson*, 477 U.S. at 255. *See also Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). Summary judgment for the moving party is proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### III. Discussion

To establish a *prima facie* case of discrimination under the ADA, a plaintiff must show that she (1) is disabled, (2) is a "qualified individual," and (3) was discriminated against because of her disability. *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001). No party disputes that Waldrop is disabled. The Court must then consider whether Waldrop is a qualified individual. If she is a qualified individual—or if there is a dispute of fact on this issue—the Court then asks whether the employer provided a reasonable accommodation for her disability, since unlawful discrimination includes "not making reasonable

accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability" unless doing so "would impose an undue hardship" on the employer. 42 U.S.C. § 12112(b)(5)(A).

Additionally, as part of the reasonable accommodation analysis, an employer is not liable where it did not "obstruct an informal interactive process," made "reasonable efforts to communicate with the employee and to provide accommodations based on the information" it possessed, and where the "employee's actions caused the breakdown in the interactive process." *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997). In other words, "[l]iability simply cannot arise under the ADA" where an employee's actions caused a breakdown in the interactive process. *Id. See also Gilliard v. Ga. Dep't of Corr.*, 500 F. App'x 860, 870 (11th Cir. 2012) (finding that, where the defendants engaged in the interactive process and made reasonable efforts to communicate with the plaintiff and to provide accommodations based on the available information, the plaintiff caused a breakdown in that process because she failed to provide any medical documentation outlining her work limitations or any substantive reason explaining why the proposed alternative accommodation was unreasonable).

It is unnecessary for the Court to address whether Waldrop's physical presence was an essential job function. That is because she alone was responsible

for the breakdown of the interactive process. As a result, GCSD cannot be liable as a matter of law.

## A. The R&R correctly concluded that Waldrop caused the breakdown of the interactive process.

The Court agrees with the R&R's conclusion that Waldrop was responsible for the breakdown in communication. As set forth in detail above, GCSD and Waldrop were engaged in an ongoing process in an attempt to establish reasonable accommodations. In fact, after Waldrop was informed that her new start date would be August 2, Dr. Camp explicitly encouraged Waldrop to get feedback from her doctors on GCSD's proposed accommodations and encouraged her to remain engaged in the process.[28] It is clear that GCSD was still working with Waldrop and attempting to settle on mutually agreeable accommodations. For example, at one point during the conversation, Waldrop said her conversation with Dr. Smith did not feel like a negotiation, and Dr. Camp responded, "let's try to continue this and let's see where we can land."[29] At another point, Dr. Camp told Waldrop that she "would argue we're still kind of involved in the interactive process."[30]  Maybe most importantly, Dr. Camp told Waldrop (who agreed at all points) that the process was a negotiation and the goal was to "come up with something that

---

[28]   ECF 30-2, at 46–47.

[29]   *Id.* at 47.

[30]   *Id.*

would be a win-win" for all parties and that "at some point, [they] might get to the point where . . . this is all we can come up with . . . but [she didn't] think [they were] there yet."[31] Dr. Camp explicitly told Waldrop to present the latest set of accommodations—including a nearly private, self-contained workspace—to her doctor, to see if there is anything else she needs, and "come back with [that] as part of this interaction."[32]

Waldrop did not accept the proposed accommodations or provide feedback from her doctors to GCSD. The record reveals why that might be—when Waldrop presented her doctor with the proposed accommodations, according to Waldrop, her doctor believed the offered accommodations would be substantively equivalent to working from home.[33] Her doctor did note that, of course, at home Waldrop could control "everybody" and "all the cleaning products" but otherwise, the accommodations were no different than working from home. Waldrop did not convey this to GCSD, did not provide any additional documentation, and did not provide an explanation as to why she believed the proposed accommodations were insufficient.

---

[31] *Id.*

[32] *Id.* at 46.

[33] ECF 28-3, at 147–48.

Instead, she took a leave of absence, moved out of state, and began working at a different company.[34] Waldrop's subjective belief that her requested accommodation was not going to be granted did not exempt her from engaging in the interactive process, or at least providing a substantive reason why she believed the accommodations were not reasonable. Without that, GCSD had no opportunity to continue finding accommodations that might suffice. Waldrop's decision to dis-engage from the process forfeits her ability to seek redress from GCSD now. Thus, the R&R correctly concluded that Waldrop caused the breakdown of the interactive process as a matter of law.

## IV. Conclusion

The Court **OVERRULES** Waldrop's objections, **ADOPTS** the R&R's recommended judgment [ECF 39], **GRANTS** GCSD's motion for summary judgment [ECF 28], and **DENIES** Waldrop's motion [ECF 29]. The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendant and close this case.

**SO ORDERED** this 27th day of March, 2024.

Steven D. Grimberg
United States District Judge

---

[34] ECF 27-1, at 131–33.